# EXHIBIT 5

1   FROM FEBRUARY 11TH, 2014, UNTIL JANUARY 20TH, 2017, ONLY

2   8 PERCENT OF DR. GANESH'S CLAIMS --

3           MR. DELAHUNTY:  ASKED AND ANSWERED.

4           MR. HOROWITZ:  I CLARIFIED IT WITH SPECIFIC DATES.

5           THE COURT:  OVERRULED.

6       GO AHEAD, PLEASE.

7   BY MR. HOROWITZ:

8   Q.  ONLY 8 PERCENT OF DR. GANESH'S CLAIMS WERE PAID BY YOUR

9   INSURANCE COMPANY?

10  A.  I DON'T KNOW.

11          MR. HOROWITZ:  OKAY.  I HAVE A DOCUMENT THAT COUNSEL

12  HAS, BUT I'LL SHOW HIM WITH YOUR PERMISSION, YOUR HONOR, TO SEE

13  IF IT REFRESHES HER RECOLLECTION.

14          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

15      (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

16  BY MR. HOROWITZ:

17  Q.  LET ME SHOW YOU, JUST FOR YOUR OWN LOOKING AT, BUT NOT TO

18  READ TO ANYBODY, A DOCUMENT THAT'S TITLED CASE DETAILS REPORT,

19  AND I'LL ASK YOU TO LOOK AT PAGE 30 THROUGH 31.

20          WITH YOUR PERMISSION?

21          THE COURT:  GO AHEAD, PLEASE.

22  BY MR. HOROWITZ:

23  Q.  NOW, WITHOUT READING WHAT'S IN IT, AM I SHOWING YOU AN

24  INTERNAL ANTHEM DOCUMENT AND A PORTION THAT YOU GENERATED?

25  A.  YES.

1  A.  NO.

2  Q.  SO BLUE SHIELD HAS NEVER WRITTEN A LETTER TO DR. BELCHER

3  SAYING, "HEY, YOU SHOULD CODE THIS DIFFERENTLY"?

4  A.  NOT TO MY KNOWLEDGE.

5  Q.  HAS DR. GANESH EVER HAD ANY OF THESE ADVERSE CONSEQUENCES

6  FROM AN INVESTIGATION?

7  A.  NOT TO MY KNOWLEDGE.

8  Q.  NOW, YOU MENTIONED THIS -- YOU MENTIONED THIS INTERNAL

9  POLICY ABOUT MASSAGE THERAPY.

10      NOW, IS THAT POLICY IN THE CPT BOOK?

11 A.  NO.

12 Q.  THAT'S A PROPRIETARY -- THAT'S A POLICY THAT'S SPECIFIC TO

13 BLUE SHIELD OF CALIFORNIA; RIGHT?

14 A.  YES.

15 Q.  AND, IN FACT, THERE'S -- BLUE SHIELD IS NOT THE SAME

16 ORGANIZATION IN EVERY STATE; RIGHT?

17 A.  RIGHT.  IT'S AN INDIVIDUAL, INDEPENDENT LICENSEE OF THE

18 BLUE CROSS BLUE SHIELD ORGANIZATION, OR ASSOCIATION.

19 Q.  RIGHT.  AND, IN FACT, BLUE CROSS CALIFORNIA IS NOT THE

20 SAME COMPANY AS BLUE SHIELD CALIFORNIA?

21 A.  RIGHT.

22 Q.  BLUE CROSS IS PART OF ANTHEM; RIGHT?

23 A.  IN CALIFORNIA, YES.

24 Q.  BUT IN OTHER PLACES, IT WORKS DIFFERENTLY; RIGHT?

25 A.  RIGHT.

1  THE COURT: ALL RIGHT. THANK YOU.

2  BY MR. HOROWITZ:

3  Q. DOES THE AMERICAN MEDICAL ASSOCIATION HAVING BILLING
4  RULES, SUCH AS MAYBE SOMETHING CALLED THE CPT CODES?

5  A. THEY HAVE GUIDELINES. THESE ARE GUIDELINES.

6  Q. THE GUIDELINES. SO THE BILLING RULES ARE JUST GUIDELINES,
7  THEY'RE NOT HARD AND FAST RULES; RIGHT?

8  A. I DON'T KNOW IF I WOULD SAY THAT. THIS IS THE STANDARD
9  FOR PROVIDERS TO BILL FOR. FOR AETNA, THIS IS THE STANDARD WE
10 GO BY.

11 Q. OKAY. HOW HAS AETNA COMMUNICATED ITS INTERPRETATIONS OF
12 THE GUIDELINES TO DR. GANESH?

13     MR. DELAHUNTY: ASKED AND ANSWERED.

14     THE COURT: SUSTAINED.

15 BY MR. HOROWITZ:

16 Q. SO SINCE APRIL OF 2012, AETNA HAS REFUSED TO MAKE PAYMENT
17 TO DR. GANESH UNLESS THE CLINICAL DOCUMENTATION SUPPORTED
18 AETNA'S VIEW OF 99215 AND THE OTHER CODES; IS THAT CORRECT?

19 A. THAT'S CORRECT.

20 Q. LET'S TALK ABOUT THE DATABASE WHICH LED TO THE
21 SPREADSHEET.

22     WHAT HAVE YOU PERSONALLY DONE TO CHECK THE INTEGRITY OF
23 THE DATA IN THE SPREADSHEETS PROVIDED TO THE GOVERNMENT IN THIS
24 CASE?

25 A. I'VE RUN CLAIM DATA MYSELF USING TAX IDENTIFICATION

FD-302a (Rev. 05-08-10)

209B-SF-4670452

Continuation of FD-302 of  Interview of Sharon Thomas , On 02/25/2015 , Page 3 of 4

charts after hours when the office employees were not present. AFU returned to work the next morning with a lot of paperwork to complete.

BELCHER's medical assistant, LUCE DELGADILLO, telephone number 831-332-6990, was the only employee BELCHER allowed to assist with his billing. DELGADILLO input billing codes for BELCHER's patients.

GANESH and BELCHER directed office employees to use certain billing codes. They created sheets containing the selected billing codes. The office filing system was horrible. Insurance records were dispersed throughout the office.

November of 2013, CMG transitioned from hard-copy patient charts to electronic records. CMG used Electronic Medical Records (EMR) by E-clinical. THOMAS recalled two females, one named BARBARA GRIMES, from El Camino Hospital provided training to the office employees.

BELCHER maintained his patients' paper charts in the front of the office. GANESH maintained her patients' paper charts toward the back of the office. There were archived patient charts in the storage room of the physical therapy office. The physical therapy office was located in unit 160, a different suite in the same office building.

THOMAS was paid twice a month with direct deposit. The last two months, June and July of 2014, THOMAS was paid "under the table". THOMAS received more money because taxes were not deducted from her check. There was a change in the payment process. BELCHER complained stating he paid his payroll service, PayChecks, more than he paid his employees. BELCHER needed to find a more reasonable payroll service. In the interim, he paid employees under the table. THOMAS had not received her W-2s for 2014 wages at the time of the interview.

==THOMAS never witnessed GANESH or BELCHER falsify records for insurance companies.==

THOMAS received gifts from GANESH for the Christmas holiday.

Patients paid out-of-pocket if CMG did not accept their insurance. BELCHER did not see any patients with "Obamacare".

BELCHER's patients were not required to pay a co-pay. GANESH's patients had co-pays. Occasionally, the front desk employees forgot to collect the co-pay from the patients.

The office was not a good environment. THOMAS had a second job. One evening while on her second job, BELCHER called regarding his surgery

REPORTS-002634