# Affidavit of Mark Flores

I, Mark Flores, am currently employed as a Medical Claims and Electronic Data Information expert. The attorney for Vilasni Ganesh, M.D., Wm. Michael Whelan, Jr., consulted with me regarding the most efficient and accurate method to verify or dispute the government's amount of loss and restitution figures derived from "source spreadsheets" that were created by victim insurers from electronic data information (EDI) that each insurer is required to maintain, as described below.

1. **Insurer Production of Specific EDI Data Would Not be Unduly Burdenson, and is Required by Law when Requested by the Physician Provider**

The Congress addressed the need for a consistent framework for electronic transactions and other administrative simplification issues in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191, enacted on August 21, 1996. HIPAA has helped to improve the efficiency and effectiveness of the health care system in general, by encouraging the development of standards and requirements to facilitate the electronic transmission of certain health information.

Through subtitle F of title II of HIPAA, the Congress added to title XI of the Social Security Act (the Act) a new Part C, titled "Administrative Simplification." Part C of title XI of the Act now consists of sections 1171 through 1180. Section 1172 of the Act and the implementing regulations make any standard adopted under Part C applicable to: (1) Health plans; (2) health care clearinghouses; and (3) health care providers who transmit any health information in electronic form in connection with a transaction for which the Secretary has adopted a standard.

HIPAA requires the Secretary of the Department of Health and Human Services (HHS) to adopt standards that covered entities (health plans, health care clearinghouses, and certain health care providers) must use when electronically conducting certain health care administrative transactions, such as claims, remittance, eligibility, and claims status requests and responses. HIPAA mandates that the healthcare industry use standard formats for electronic claims and claim-related transactions.

The purpose of these standards and HIPAA's intent is to create better access to health insurance, limit fraud and abuse and reduce administrative costs. The National Committee on Vital and Health Statistics (NCVHS) has recommend that CAQH CORE, in cooperation with NACHA, develop the healthcare operating rules for healthcare EFT and ERA and the NACHA CCD+ as the healthcare EFT standard format. Almost a decade ago, CAQH established the Committee on Operating Rules for Information Exchange, also known as CAQH CORE.

CAQH CORE is an industry-wide stakeholder collaboration committed to the development and adoption of national operating rules for administrative transactions.

Not only does CAQH CORE develop operating rules, it also offers a voluntary certification program *so organizations can demonstrate they have adopted and are adhering to those rules.* CAQH CORE certification verifies that an organization or product operates in agreement with the operating rules and the underlying standards, and is doing so with their

trading partners as well. It should be noted that all the victim insurance carriers are <u>CORE Participating Organizations</u>.

## 2. **Examination of the EDI Data Underlying the Losses Claimed Is the Most Efficient and Accurate Way to Verify or Dispute Claimed Loss Amounts**

The HIPAA regulation states, "If an entity requests a health plan to conduct a transaction as a standard transaction the health plan must do so." [45 CFR §162.925]. Health insurers and self-insured employer-sponsored health insurers are <u>covered entities</u> (CE) under HIPAA. As such, they <u>must</u> comply with all applicable HIPAA regulations, including the HIPAA TCS rule. A health insurer that does not accept a standard transaction *or produce one of the transactions for which it is responsible (such as the electronic remittance advice) is in violation of the law*.

After review of the "source spreadsheets" submitted by the carriers, there appear to be numerous abnormalities and missing information that call into question the losses and restitution amounts claimed by the insurers while raising questions as to the true injured party or victim.

Specifically, not one of the claim line items in the "source spreadsheet" identity whether the claim was derived from a fully insured health plan or self-insured health plan or payer. If the claim payment originated from a self-insured health plan or payor, the insurance carrier did not actually pay the claim and may not be eligible for restitution.

Additionally, many claim line items in the "source spreadsheet" do not designate a "Check Number" or payment ID number. Regardless of whether an actual paper check was issued or an electronic fund transfer (EFT) was initiated, ALL payments must have a number that identities the payment. The fact that many of the line items do not contain any identifying "Check Number" or payment ID evidences the possibility that no amount was actually paid on the claim.

Next, many of the claim line items contain negative valuations, as evidenced by the brackets ( ) in the "source spreadsheet". Traditional insurance industry practices typically associate negative values as "Overpayment Offsets" or "Recoveries", whereby claims administrators will allege an overpayment was made on a particular claim, demand a refund on the allegedly overpaid "debt", then "Offset" or "Withhold" the amount that was allegedly overpaid, from a completely different claim, in essence balancing out the "debt".

Finally, other discrepancies are present in the "source spreadsheet" such as "Claim Line Status Code" where the code DND (indicating denied) is present. This again calls into question whether a "denied" claim was actually paid to the medical provider.

Ultimately, these irregularities require the examination of EDI data in order to verify and validate the entity that paid the claim, how much was actually paid and to whom it was paid.

## 3. **The Specific EDI Data Requested is Outlined Below**

Based on anomalies in the "source spreadsheets" and consistent with the insurer's identification as CORE Participating Organizations, we request the following documents and or data points:

   a. Information identifying and distinguishing claims derived from fully insured health plans versus claims derived from self-insured health plans, in order to determine the injured party or victim
   b. CCD + ADDENDA (i.e., ACH file for Payment): identifies payer, i.e. the entity that paid the claim
   c. ANSI X12 277 Claim Status Response: shows whether the claim was accepted, and the designated assignee and/or payee
   d. ANSI X12 835 Electronic Remittance Advice: shows how much was paid on the claim
   e. The claim "reassociation" and trace information from the Plan/Payor: needed to "tie" the EFT payment/Check to the electronic remittance advice/EOB, i.e. identifies, tracks and confirms the entity to whom the payment was made
   f. Identification of any "Overpayment Offsets", "Recoveries" or "Withholding" done in association with any of the claims identified in the "source spreadsheet"

4. **Permitted Uses**

The proposed subpoenas do not request any data related to "Treatment" rather we are only concerned with the data as it relates to the "Payment" portion of the electronic transaction. Additionally, the general provisions under 45 CFR 164.506 specifically dictate that "a covered entity may, ***without the individual's authorization***, use or disclose protected health information ***for its own treatment, payment and health care operations activities***; disclose protected health information to another covered entity or a healthcare provider for the ***payment activities of the entity that receives the information***.

The HIPAA Privacy Rule establishes a foundation of Federal protection for personal health information (PHI). As such, the Rule generally prohibits a Covered Entity from using or disclosing PHI unless authorized by patients, ***except where this prohibition would result in unnecessary interference with access to quality health care or with certain other important public benefits or national priorities***.

Access to treatment and efficient payment for health care, require use and disclosure of PHI and are essential to the effective operation of the health care system. In addition, certain health care operations—such as administrative, financial, legal, and quality improvement activities—conducted by or for health care providers and health plans, are essential to support treatment and payment. As such, HIPAA Privacy Rule permits a covered entity to use and disclose PHI, with certain limits and protections, for treatment, payment, and health care operations activities. Therefore, EDI data, must be shared between Covered Entities and cannot be withheld, cannot be proprietary or deemed "personal and confidential information" in compliance with HIPAA standard operating rules.

The core health care activities of "Treatment," "Payment," and "Health Care Operations" are defined in the Privacy Rule at 45 CFR 164.501:

1. "Treatment" generally means the provision, coordination, or management of health care and related services among health care providers or by a health care provider with a third party, consultation between health care providers regarding a patient, or the referral of a patient from one health care provider to another.
2. "Payment" encompasses the various activities of health care providers to obtain payment or be reimbursed for their services and of a health plan to obtain premiums, to fulfill their coverage responsibilities and provide benefits under the plan, ***and to obtain or provide reimbursement for the provision of health care***.
3. "Health care operations" are certain administrative, financial, legal, and quality improvement activities of a covered entity that are necessary to run its business and to support the core functions of treatment and payment. These activities, which are limited to the activities listed in the definition of "health care operations" at 45 CFR 164.501, include: ***Conducting or arranging for medical review, legal, and auditing services, including fraud and abuse detection and compliance programs***

**5. CONCLUSION**

Section 1104 – Administrative Simplification: Adoption of Standards for Health Cared Electronic Funds Transfers (EFTs) and Remittance Advice identified the NACHA CCD+Addenda as the HIPAA standard for healthcare EFT transactions. 45 CFR 162.925 requires that health plans deliver the HIPAA EFT standard for claims remittances, if it is requested by the provider. The aim of Section 1104 is to improve the processing procedures and standardization of healthcare administration. The aim of Section 1104 is to improve the processing procedures and standardization of Healthcare administration.

I, Mark Flores, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____  _____
Date                                                                       Mark Flores