ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JEFFREY D. NEDROW (CABN 161299)
PATRICK R. DELAHUNTY (CABN 257439)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5045
    FAX: (408) 535-5066
    Email: Jeff.nedrow@usdoj.gov
    Email: Patrick.delahunty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 16-CR-00211 LHK |
|     Plaintiff, | ) <br> ) UNITED STATES' SENTENCING <br> ) MEMORANDUM |
|   v. | ) <br> ) Date: July 25, 2018 |
| VILASINI GANESH, | ) Time: 9:15 a.m. <br> ) The Hon. Lucy H. Koh |
|     Defendant. | ) <br> ) **REDACTED COPY** |

# TABLE OF CONTENTS

I.      Introduction……………………………………………………………………………1

II.     Guidelines Calculations……………………………………………………………...2

        A.  Loss Amount………………………………………………………………………2

            1.  Relevant Conduct to Consider……………………………………………...2

                (i)     Factual Background regarding Ganesh and Belcher's Efforts to Submit False
                        Claims……………………………………………………………………2

                (ii)    Argument…………………………………………………………………7

        B.  Upward Adjustment for Leadership Role in the Offense………………………………...8

        C.  Adjustment for Abuse of Position of Trust…………………………………………10

        D.  Adjustment for Offense Involving Ten or More Victims………………………………12

        E.  Adjustment of Obstruction of Justice………………………………………………12

        F.  Acceptance of Responsibility………………………………………………………17

        G.  The Total Offense Level Should be 30………………………………………………17

III.    Section 3553(a) Factors……………………………………………………………...17

        A.  The Nature and Circumstances of the Offense, Including its Seriousness………………18

        B.  The Nature and Circumstances of the History of the Defendant………………………...18

        C.  Deterrence………………………………………………………………………18

IV.     Restitution……………………………………………………………………………19

V.      Conclusion…………………………………………………………………………...19

1

## TABLE OF AUTHORITIES

2

3

Cases

*United States v. Adam,*
  70 F.3d 776 (4th Cir. 1995) ........................................................................ 10

*United States v. Barson,*
  845 F.3d 159 (5th Cir. 2016) ....................................................................... 12

*United States v. Cooper,*
  94 F.3d 653 (9th Cir. 1996) ........................................................................... 9

*United States v. Dare,*
  425 F.3d 634 (9th Cir. 2005) ......................................................................... 7

*United States v. Dunnigan,*
  507 U.S. 87 (1993) ............................................................................... 13, 15

*United States v. Garro,*
  517 F.3d 1163 (9th Cir. 2008) ..................................................................... 13

*United States v. Hopper,*
  177 F.3d 824 (9th Cir.1999), *cert. denied*, —— U.S. ——, 126 S.Ct. 2959, 165 L.E.2d 970 (2006).... 7

*United States v. Leung,*
  35 F.3d 1402 (9th Cir. 1994) ......................................................................... 9

*United States v. Lofton,*
  905 F.2d 1315 (9th Cir. 1990) ..................................................................... 13

*United States v. Magana–Guerrero,*
  80 F.3d 398 (9th Cir. 1996) ......................................................................... 15

*United States v. Masters,*
  613 Fed.Appx. 618 (9th Cir. 2015) ............................................................. 12

*United States v. Onwuzulike,*
  488 F. App'x 208 (9th Cir. 2012) .................................................................. 8

*United States v. Peters,*
  962 F.2d 1410 (9th Cir. 1992) ..................................................................... 10

*United States v. Rutgard,*
  116 F.3d 1270 (9th Cir. 1997) ..................................................................... 10

*United States v. Staten,*
  466 F.3d 708 (9th Cir. 2006) ......................................................................... 7

*United States v. Taylor,*
  749 F.3d 842 (9th Cir. 2014) ................................................................. 13, 15

*United States v. Torres-Rodriquez,*
  930 F.2d 1375 (9th Cir. 1991) ..................................................................... 13

*United States v. Vivit,*
  214 F.3d 908 (7th Cir. 2000) ....................................................................... 11

Statutes

18 U.S.C. § 1347 ................................................................................................. 6

Rules

U.S.S.G. § 1B1.3 .................................................................................................. 7
U.S.S.G. § 2B1.1 .............................................................................................. 2, 12
U.S.S.G. § 2B1.1(b)(2)(A) ................................................................................ 12
U.S.S.G. § 3B1.1 ............................................................................................... 8, 9
U.S.S.G. § 3B1.1(c) ........................................................................................ 9, 10
U.S.S.G. § 3B1.3 ........................................................................................... 10, 12

U.S.S.G. § 3C1.1 ................................................................................................ 12, 13, 15, 17

U.S.S.G. § 3C1.1 (6) .......................................................................................................... 13

The United States of America, by and through its attorneys of record, herein submits its sentencing memorandum as to defendant Vilasini Ganesh.

## I.    Introduction

Between 2008 and 2015, Dr. Vilasini Ganesh knowingly submitted tens of thousands of false claims for payment to health care insurers in her capacity as a general practice physician at the Campbell Medical Group.  In a subset of those claims, Ganesh claims falsely asserted that patient care had been provided by Dr. Edward DeWees, a physician with whom she had worked, and who had long ago retired when the claim was submitted.  Ganesh also submitted claims falsely suggesting that she had provided care to patients on weekends and holidays when she had not, and further submitted claims for services she simply did not provide.

During her trial in this case, Ganesh admitted during her testimony that she submitted the claims, but sought to blame her conduct in doing so on the retired Dr. DeWees, testifying that she was just following the procedure she had purportedly learned from him.  This testimony was knowingly false; in fact, the trial testimony of Lori Landis and Cindy Jamison plainly established that Ganesh had been warned of the impropriety of her conduct as far back as 2006.  Ganesh was fully aware that she was not permitted to simply submit whatever claim she deemed appropriate to maximize her profits, but she insisted on doing so out of greed and entitlement.  The evidence at trial established that Ganesh treated the insurers as a perpetual, easy-access cash source, sending in requests designed to optimize her payout, without regard for their accuracy.  She also victimized her patients by fraudulently using their identities to further her scheme with submission of false claims.  It was this kind of mind-set that led her to bill claims that, if accurate, would amount to Ganesh providing more than 24 hours of medical care a day on some occasions, as well as submit so many false billings on weekends when she did not work.  Her falsified claims resulted in insurers paying her hundreds of thousands of dollars based on false pretenses.

The government anticipates that the defense will argue that Ganesh's conduct does not warrant a lengthy sentence.  The government disagrees.  This was an egregious fraud that lasted nearly ten years. Its scope is also reflected in: Ganesh's leadership role in directing her staff to execute that fraud, her abuse of her position of trust as a doctor, her efforts to obstruct justice, her victimization of many of her patients through her misuse of their personal information, and her total failure to accept responsibility. These are all factors that, in combination, warrant a significant prison sentence.  A mid-range guideline

sentence fairly addresses the seriousness of her fraudulent conduct.  The government requests that the Court find the appropriate guideline range to be a level 30, and requests that the Court impose a mid-range guideline sentence of 108 months imprisonment.

## II.    Guideline Calculations

The base offense level for Ganesh's conduct is six.  U.S.S.G. § 2B1.1 (a) (2).  As described below, the total offense level should be increased because of the loss amount and adjusted upwards because of Ganesh's role, position of trust, the number of victims, and obstruction of justice.  Ganesh has never accepted responsibility for her conduct and should receive no reduction under that guideline.

### A.    Loss Amount

The government has sought to assess the loss in an extremely conservative manner, in a light which is favorable to Ganesh, and in a manner that resolves many disputed facts in her favor.  The government respectfully requests that the Court hold Ganesh accountable for a loss of $688,698, a calculation which focuses on the claims falsely submitted by Ganesh that identify Dr. DeWees as the treating physician.   Below, the government articulates the facts and evidence related to Ganesh's relevant conduct, and the authority that supports considering this conduct for purposes of the loss calculation.

#### 1.    Relevant Conduct to Consider

##### (i)    Factual Background regarding Ganesh and Belcher's Efforts to Submit False Claims

In 2004, Ganesh met Dr. Gregory Belcher, an orthopedic surgeon in the Bay Area.  Although Belcher performed surgeries at various hospitals, he maintained an office in Saratoga, California, and in approximately 2005 he asked Ganesh to move her practice to the same space.  *See* Exhibit 1 (11/28 RT 243:22-24).  From that point forward, Belcher and Ganesh worked together, and within a few years of that, they began living together, had children together, and agreed that they were "married."  This was true until at least 2015.

Ganesh, by her own testimony and that of every other witness at trial, was not adept at running a medical practice.  Exhibit 1 (RT 11/28 at pp. 25:1-2) (Ganesh: "And I don't have a lot of knowledge about how to do things outside of medicine, these administrative things.").  However, she did

demonstrate an aptitude for false, and voluminous, billing of insurers, and beginning in 2008, and continuing through at least 2015, she routinely submitted fraudulent claims to insurers as a matter of practice. *Cf.* ECF No. 299 (verdict as to Ganesh's fraud convictions). The fraudulent claims were false in a number of respects. The three most common fraudulent means were: (1) falsely identifying the date of service, (2) falsely identifying the care provided, and (3) falsely identifying the doctor that provided the care. Ganesh also admitted at trial that she primarily, and almost exclusively, submitted claims to her patients' insurers that identified only one of two CPT codes. *See* Exhibit 1 (RT 11/27 at p. 247:4-12.) For example, Ganesh testified:

> Q.     Dr. Ganesh, isn't it true that actually between 2008 and 2014, I mean, on hundreds, if not thousands of times, you submitted 99215 and 99245 claims to the insurance companies, is that correct?
>
> A.     Those are the only codes we used, I believe.

*Id* at RT 11/27 at p. 250:18-22.

Ganesh's billing history confirmed this pattern, and it also indicated that she and Belcher commonly billed insurers, although primarily Anthem, as if Dr. DeWees was treating Ganesh's patients. *See* Exhibit 6 (filed under seal) (Trial Exhibit 38b). Trial Exhibit 38b indicated a dramatic shift by Ganesh in 2010 and 2011; prior to that time period, Ganesh submitted claims to Anthem identifying Ganesh as the providing doctor, while after that period, Dr. DeWees was identified.[1] Additionally, during trial testimony, a multitude of patients, when shown examples of bills submitted regarding their purported care, confirmed that they were not seen on the dates claimed.

Ganesh's fraudulent billing was sufficiently egregious that in 2005 her medical biller at the time, Lori Landis, expressed concerns about the obviously fraudulent nature of Ganesh's billing. Landis specifically told Ganesh's partner, Belcher, that she was concerned with Ganesh's practice of claiming the same two billing codes for reimbursement in each claim. Exhibit 1 (RT 10/24 94:6-25). Landis stated that she had informed Belcher about Ganesh's fraudulent billing, confirming on cross-examination by Belcher's attorney that she was "almost positive" she had informed Belcher of the "red flags" in Ganesh's billing in 2005. Exhibit 1 (RT 10/24 at p. 151); *id.* at p. 99 (describing meeting); *and*

---

[1] The pattern is evident by comparing the worksheets (or tabs) ending -871 and -757.

1   *see id.* at p. 103 (Landis remembered in 2005 that she "didn't understand how you could have no many

2   high level codes on a consistent basis" and wanting to leave practice). Belcher told Landis that he

3   "would take care of" the problematic billing. *Id.* at p. 99. As proven at trial, Belcher did not "take care

4   of" the problem, and in fact only exacerbated it by submitting "stacks" of Ganesh's fraudulent claims to

5   insurers himself years later between 2010 and 2014. *Id.* at RT 12/1 52:9 (Belcher admission regarding

6   "stacks"); 202:5—10 (helping from 2010-2014). He did so by taking the information Ganesh scribbled

7   on "superbills," which were one-page forms with various boxes associated with various CPT codes.

8   Exhibit 1 (RT 12/1 51:21—54:16). Most of these superbills reflected a patient name, various dates

9   scribbled in colored marker, and one (or perhaps both) of the two CPT codes Ganesh assigned to each

10  visit: 99215 and 99245. *Id.* at RT 12/1 51:21—54:16 (Belcher describing codes on bills); *see also*

11  Exhibit 7 (filed under seal) (Trial Exhibits 111-3, 111-25, 111-27, example superbills submitted in 2013

12  and 2014 for patients called at trial). These codes had the highest reimbursement rates, and Ganesh and

13  Belcher both knew it.

14        The fraudulent nature of these superbills was self-evident. For example, Cindy Jamison, the

15  biller hired by Ganesh after Belcher and Ganesh terminated Landis, was tasked in 2006 with submitting

16  the superbills. Exhibit 1 at RT 10/24 219:19—22 (inputting information on superbill into HCFA 1500

17  form); 220:9—23 (same). Jamison testified that she was given stacks of Ganesh's superbills and asked

18  to submit claims for reimbursement to insurers. *Id*. at 214:13—215:3 (receiving superbills). Despite

19  having no training in the meaning or application of CPT codes (she merely input the data on the

20  superbills), Jamison, like Landis, also came to the conclusion that Ganesh was fraudulently billing

21  insurers. *Id.* at RT 10/24 198:20-21 (Jamison: "But to me, it felt like she [Ganesh] was committing

22  fraud and I wasn't comfortable.")

23        Ganesh and Belcher spent and enjoyed the proceeds of their fraudulent billing scheme. This was

24  established by the evidence that showed the flow of money out of two Campbell Medical Group

25  accounts, Bank of America -6781 and -8753, and into Belcher's personal Bank of the West account, -

26  7654. For example, Belcher withdrew approximately $25,800 from Bank of America account -6781

27  and deposited it into his personal account. Exhibit 2 (Trial Exhibit 129-1). Similarly, approximately

28  $301,700 was transferred by Ganesh and Belcher out of Bank of America account -8753 and into

1  Belcher's Bank of the West account -7654.  *Id.* at 129-2 and -3.  Belcher confirmed at trial that money

2  from the two accounts went towards paying for upkeep and renovations at the residence shared by

3  Ganesh and Belcher.  Exhibit 1 RT 12/1 at pp. 27-28 and 12/8 at pp. 54 (Belcher owned house); 71-72

4  (Belcher: money paid contractors).  Belcher also used money from the -8753 account to purchase the

5  house next door as an investment property.  Exhibit 1 RT 12/8 at pp. 53-54.  As also described by

6  Ganesh's staff, Ganesh enjoyed extravagant vacations, luxury shopping, and import automobiles.

7        Ganesh did not limit her fraudulent conduct to just her patients.  She also facilitated Belcher's

8  willful submission of false claims regarding his physical/massage therapy patients, encouraging her

9  patients to get a massage at the clinic (which was adjacent to her office).  As patient S.K. explained:

10      Q.     Did Dr. Ganesh recommend or refer you to a massage therapy?

11      A.     Yes. She said that "our office has a massage therapy and it's very good for
diabetes patients to take massage," and she would tell me that "you can sign up

12      for the massage and go for it."

13  Exhibit 1 at RT 11/13 at p. 138.  When patient S.K. asked if it would be covered by insurance, Ganesh

14  assured patient S.K. it would be.  *Id.* at p. 139 ("Dr. Ganesh told me they're [massages] are all covered"

15  and "she said the insurance would cover it.").  Belcher did not accept patients from any doctors except

16  Ganesh.  RT 12/1 at p. 109-10 (Belcher: "I can only think of two patients" referred from anyone except

17  Ganesh or Belcher).  Tellingly, two of the patients that Belcher used to defraud insurers most frequently

18  were Ganesh referrals, A.B. and M.H. (both of whom testified at trial).

19        Despite her false claims to the contrary at trial, Ganesh was clearly on notice that submission of

20  false and inaccurate claims could result in criminal penalties each and every time she submitted a claim.

21  Claims received by health care insurers, including M.H.'s insurer, Cigna, are received on a HCFA 1500

22  form.  Exhibit 1 at 11/20 RT 173:11—19 (Kahler, Cigna); Exhibit 3 (Trial Exhibit 143, blank HCFA

23  1500 form).  Each HCFA 1500 form includes a jurat, requiring the submitting health care provider to

24  attest under penalty of perjury that the claim is accurate and to acknowledge that false information in the

25  claim exposes the provider to criminal and civil penalties.  *Id.* at RT 173:11—174:22.

26        The jury convicted Ganesh of every substantive billing-related count with which she was

27  charged--five counts of health care fraud and five counts of submitting a false claim to a health care

28  benefits program, in violation of 18 U.S.C. §§ 1347 and 1035, respectively.  She was acquitted of two

SENTENCING MEMORANDUM RE GANESH
CASE NO. 16-CR-211 LHK         5

conspiracy counts (to commit health care fraud and to commit money laundering) and six counts of money laundering.  The government proved that as to each of the ten counts of conviction, Ganesh had submitted a false claim, or made a false statement, to an insurer regarding the treatment purportedly provided to the patient on the specific date, and received payment for those claims.  The jury specifically found Ganesh guilty of committing health care fraud through false submissions on the following dates as to the following patients:

| Count | Defendant | Date of Claimed Care | Beneficiary | HCBP | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|
| 2 | GANESH | 06/28/2012 | S.S. | Anthem Blue Cross | 06/17/2013 | $1,454.14 |
| 3 | GANESH | 03/05/2012 | M.K. | Blue Shield | 04/19/2013 | $432.16 |
| 4 | GANESH | 12/30/2012 | M.H. | Cigna | 07/08/2013 | $1,000.00 |
| 5 | GANESH | 02/17/2014 | A.D. | UnitedHealthcare | 05/20/2014 | $4,744.15 |
| 6 | GANESH | 09/21/2012 | S.K. | Aetna | 01/02/2013 | $6,627.61 |

The jury further found Ganesh guilty of making false statements relating to health care matters, on the following dates and occasions:

| Count | Def. | Date Claim Sub'd | Bene'y | HCBP | CPT Code /TIN Billed | Nature of Proof of False Representation |
|---|---|---|---|---|---|---|
| 11 | GANESH | 12/23/ 2013 | S.S. | Anthem Blue Cross | 99215 / xx43757 | Impermissible usage of TIN associated with another provider; alleged service not performed on 12/31/2012 for duration claimed |
| 12 | GANESH | 08/10/ 2013 | M.K. | Blue Shield | 99245/ xx43757 | Impermissible usage of TIN associated with another provider; alleged service not performed on 06/02/2012 and for duration claimed. |

| 13 | GANESH | 03/29/2013 | M.H. | Cigna | 99215/xx47871 | Services not provided on three successive days (12/29/2012, 12/30/2012, and 12/31/2012) for the duration claimed |
| 14 | GANESH | 05/12/2014 | A.D. | United-Healthcare | 99215/xx47871 | Service not rendered on date indicated for duration claimed |
| 15 | GANESH | 12/10/2012 | S.K. | Aetna | 99245/xx47871 | Service not rendered on dates and for duration claimed |

**(ii)     Argument**

Ganesh should be held accountable for the totality of her fraudulent conduct.  Ganesh was convicted of all ten substantive health care fraud counts with which she was charged.  The ten counts of conviction, however, represent only a fraction of the overall scope of Ganesh's fraud.  As the Court is aware, the United States Sentencing Guidelines provide that a defendant in this circumstance should be held accountable for conduct relevant to the scheme, which includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3 (a) (1) (B).  "The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." *Id.* § 1B1.3 cmt. n.1.  For purposes of sentencing, the focus is on acts for which a defendant should be held accountable rather than criminally liable.  *Id.* In determining relevant conduct, a court should specifically look to "the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.* the scope of the specific conduct and objectives embraced by the defendant's agreement)." *Id.* at § 1B1.3, cmt. n.2.  "[A]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing," though where an extremely disproportionate sentence results from the application of an enhancement, 'the government may have to satisfy a "clear and convincing" standard.' " *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005) (quoting *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir.1999))), *cert. denied,* ―― U.S. ――, 126 S.Ct. 2959, 165 L.E.2d 970 (2006).  The government has no objection to the Court applying the clear and convincing standard to this case because of the significant effect of the loss calculation on Ganesh's guideline range.  *E.g., United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006) ("facts found in support of Guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed [must] be established by clear and

convincing evidence," rather than the otherwise applicable preponderance of the evidence standard.)

The loss amount associated with fraudulent claims submitted for Ganesh patients that falsely asserted Dr. DeWees was the rendering physician, limited to 2010 to 2014, is $688,698.  *See* Exhibit 4 (summary chart).  The basis for this loss is fully explained in a 120-page chart that indicates each source spreadsheet and row-number on each source spreadsheet, all of which were exhibits at trial.  *See* Exhibit 8, filed under seal.

The government has exercised leniency in recommending this amount.  Indeed, in an effort to resolve as many disputed factors regarding loss as possible in Ganesh's favor, the government has limited its loss-calculation to the actual loss, which is the paid loss; the loss amount does not include the intended loss (the money sought by the claim but not paid).  This loss amount should be attributed to Ganesh because it is amply supported by the evidence, and in fact constitutes a highly conservative assessment of the overall loss which was likely incurred by Ganesh's fraudulent conduct.  *United States v. Onwuzulike*, 488 F. App'x 208, 210 (9th Cir. 2012) ("The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information.")  For example, though the government believes that Ganesh is equally liable for the loss incurred by Belcher with respect to his fraud in connection with his massage therapy practice, the government is not requesting that Ganesh be held liable for that portion of the loss.  Similarly, substantial evidence was received by the jury that Ganesh billed using the highest reimbursable codes (99215 and 99245) regardless of the care provided or even if any care was provided.

## B.    Upward Adjustment for Leadership Role in the Offense

The government respectfully requests that the Court impose a four-level upward adjustment in the guideline calculation to reflect Ganesh's leadership role in the offense.  *See* USSG § 3B1.1.  As the lead doctor and only general practitioner in her medical practice, Ganesh occupied a significant leadership role in the fraudulent scheme in this case.  She directed multiple staff members in the submission of false claims under her name throughout the course of the conspiracy, including Sharon Thomas, Kyara Johnson, Lori Landis, Cindy Jamison, Elaine Mapa, and a number of other employees.  The staff at the practice reported to her and she controlled the billing.  She orchestrated the firing of Lori

Landis when Landis challenged her on her false billing practices, sending a coercive message to other employees that they would need to go along with her fraudulent billing methods or risk losing their jobs. With the assistance of a number of staff members, Ganesh organized and led extensive criminal activity over a period of at least six years.  At her direction and under her supervision, at least five employees unwittingly prepared false documents and played a role in the submission of those false documents in support of hundreds of thousands of dollars in false claims.

Ganesh's leadership role in the scheme merits a four-level adjustment to her offense level calculation.  A four-level adjustment is warranted when a "defendant was an organizer or leader of a criminal activity that involved five or more participants *or was otherwise extensive*."  U.S.S.G. § 3B1.1 (a) (emphasis added).  Although her criminal activities involved just one knowing participant (Belcher), they could not have been carried out without the "unknowing services of many outsiders."  *United States v. Cooper*, 94 F.3d 653 (9th Cir. 1996).  As Ganesh's criminal activity was clearly "extensive," a four-level upward adjustment is warranted under these circumstances.

If Ganesh's conduct does not qualify as "otherwise extensive" such that a four-level adjustment is warranted, it seems clear that a two-level aggravating role enhancement should apply.  A two-level enhancement is warranted when the defendant was an organizer, leader, manager, or supervisor in any criminal activity not otherwise covered in the Sentencing Guidelines.  U.S.S.G. § 3B1.1(c).  Where defendants "exercise control over the other members of the conspiracy" (whether knowing or unknowing members), an aggravating role enhancement is appropriate.  *United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994).

For the same reasons previously stated, this criterion is easily satisfied in Ganesh's case.  Ganesh operated a general medical practice with numerous patients and staff.  She exercised complete control over the unwitting aides to her criminal activities.  She also played a role in getting Belcher involved, by putting him in a position where he was required to defend her illegal conduct and submit her false claims

on numerous occasions.  Along with Belcher, Ganesh employed numerous staff members.  It was through these offices and with the assistance of staff members that Ganesh submitted the false claims at the heart of this case.  Ganesh's unimpeded ability, in concert with Belcher, to hire, fire, promote, and assign these various individuals to assist her with her criminal activities, qualifies her as "an organizer, leader, manager, or supervisor."  U.S.S.G. § 3B1.1(c).  Her conduct merits at least a two-level leadership role enhancement.

Ganesh cannot escape this enhancement by asserting that she and Belcher were "equal partners," or by blaming Belcher.  *United States v. Peters*, 962 F.2d 1410 (9th Cir. 1992) (declining to overturn aggravating role enhancement in a mail fraud case in which the husband claimed to be "equal partners" with his wife).  Even if the scheme was carried out by Belcher and Ganesh as "equal partners," that does not preclude a finding that Ganesh was the leader, organizer, and manager of a criminal enterprise.  And the evidence at trial clearly established that the overwhelming bulk of the false claims submitted were under Ganesh's name, not Belcher's.  Belcher testified that he largely became involved in submitting the claims in an effort to assist Ganesh.  Accordingly, the government respectfully requests that the Court impose a four-level upward adjustment to reflect her leadership role in the offense.

### C.    Adjustment for Abuse of Position of Trust

If a defendant abused a position of public or private trust in a manner that significantly facilitated the commission of the offense, a two-level increase is warranted.  U.S.S.G. § 3B1.3.  This is well established in cases involving Medicare and Medicaid.  For example, the Ninth Circuit has held "because the government as insurer depends upon the honesty of the doctor [it] is easily taken advantage of if the doctor is not honest."  *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997).  As a result, the Ninth Circuit (along with many of its sister circuits) has held that when a doctor submits claims to Medicare, they do so while enjoying a position of trust.  *Id.; see e.g., United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995).  A physician who intentionally submits false claims to Medicare does so in violation of that trust.

The reasoning that supports applying the enhancement to a doctor that defrauds a government program is equally applicable to a doctor that defrauds a private insurer.  As the Seventh Circuit explained, courts "made no distinction between [public and private insurers] in determining whether the enhancement was applicable, and we believe that no distinction exists." *United States v. Vivit*, 214 F.3d 908, 924 (7th Cir. 2000).  The Ninth Circuit has not held anything to the contrary.  Therefore, courts may assume that a doctor who intentionally makes false insurance claims to either a public or a private insurer (1) does so while enjoying a position of trust, and (2) abuses that position of trust in so doing.

The evidence at trial in this case established that insurers do not audit or verify every claim that they receive from a health care provider.  Exhibit 1 (RT 11/14 at pp. 9, 105-06 and RT 11/20 at pp. 52-54 (Richer, Aetna); RT 11/20 at pp. 71-72 (Kearney, United); RT 11/20 at pp. 171-73 (Kahler, Cigna); RT 11/21 at p. 123 (Haskins, Anthem)).  Not only that, insurers paid claims when they suspected, but had not established, that a claim was false.  For example, Mr. Kondratenko testified that Blue Shield would pay claims when it suspected, but had not proven, false billing.  Asked why, Mr. Kondratenko explained, "Well, when we get bills from the providers, we take the position that, you know, what they provided to us was medically necessary, it was a legit service, so it's kind of a trust relationship with the provider." Exhibit 1 (RT 11/27 at p. 12 (emphasis added)).  Similarly, Mr. Kearney (United) was asked by Belcher's attorney, regarding submitting claims to United, "And the expectation is that the health care provider will use their professional judgment and, you now, in good faith approximate which of these codes best describes the treatment provided in that session; right?," to which the answer was "Yes." Exhibit 1 (RT 11/20 135 (emphasis added)).  Indeed, insurers rarely inspect and audit claims. *Id.* at RT 11/14 9, 105-06 and RT 11/20 52-54 (Richer, Aetna); RT 11/20 71-72 (Kearney, United); 11/20 171-73 (Kahler, Cigna); RT 11/21 123 (Haskins, Anthem).   Amongst a number of reasons for this is that the insurers must continue to prioritize medical coverage to patients at the expense of allowing their patients' providers to potentially abuse the manner in which each insurer reviewed claims.  As a result, the process of claim submission and reimbursement between a doctor and insurer is built upon trust by the insurer that the doctor has accurately claimed reimbursement for services actually provided. The trust relationship is also reflected in the use of a jurat in the claim submission forms (HCFA 1500) forms, which advises health care providers of the penalties of not being truthful and accurate in their

1  claims to insurers.

2      Doctors occupy positions of respect in our society, and a presumption of credibility.  Ganesh

3  clearly took advantage of the trust placed in her by her patients through her conduct in this case.  She

4  also took advantage of the presumption of credibility and good faith placed in her by the insurers with

5  whom she worked.  She should be held accountable for abusing her position of trust through application

6  of the two-level upward adjustment under U.S.S.G. § 3B1.3.

7      **D.     Adjustment  for Offense Involving Ten or More Victims**

8      The government further requests that the guideline calculation be modified to include a two-level

9  upward increase under U.S.S.G. Section 2B1.1(b)(2)(A), as this offense involved 10 or more victims.

10  This guideline section applies because Ganesh submitted hundreds of false claims by using the "means

11  of identification" of dozens of actual individual patients unlawfully and without authority.  *See* Exhibit 8

12  (filed under seal).  Ganesh's use of the personal identifying information of her many patients in

13  furtherance of her fraud, without their knowledge or consent, designates these individuals as victims

14  irrespective of whether they suffered any actual financial loss, and thus provides support for the

15  application of this enhancement.  *See*, *2B1.1 Application Note 1* (definition of "means of identification);

16  *Application Note 4(E)* ("Cases Involving Means of Identification"); *United States v. Masters,* 613

17  Fed.Appx. 618, 621-622 (9th Cir. 2015); *United States v. Barson*, 845 F.3d 159, 167 n.16 (5th Cir.

18  2016) (Medicare beneficiaries whose identifies were used to file false claims to Medicare for were

19  "individual[s] whose means of identification was used unlawfully or without authority" and therefore

20  "victims" under U.S.S.G §2B1.1 (b) (2), even though beneficiaries were paid to visit fraudulent clinic

21  and procedures were either not performed or unnecessary)..

22

23

24      **E.     Adjustment for Obstruction of Justice**

25      U.S.S.G. § 3C1.1 provides a two-point adjustment where (1) the defendant willfully obstructed

26  or impeded, or attempted to obstruct or impede, the administration of justice with respect to the

27  investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive

28  conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely

related offense.  Commentary 4(b) provides that the adjustment shall apply when the defendant commits perjury.

The Ninth Circuit agrees that the adjustment applies when a defendant testifies untruthfully. *United States v. Torres-Rodriquez*, 930 F.2d 1375, 1390 (9th Cir. 1991).  Specifically, the Ninth Circuit has determined that the adjustment applies where "(1) a defendant [gives] false testimony; (2) on a material matter; and (3) with willful intent."  *United States v. Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008); U.S.S.G. § 3C1.1.  For purposes of U.S.S.G. § 3C1.1, a statement is material if it "would tend to influence or affect the issue under determination." *See* Advisory Notes to USSG § 3C1.1 (6).  Regarding the third element, "the term 'willfully' requires that the defendant 'consciously act with the purpose of obstructing justice.'"  *United States v. Taylor*, 749 F.3d 842, 848 (9th Cir. 2014) (quoting *United States v. Lofton*, 905 F.2d 1315, 1316–17 (9th Cir. 1990)).  The adjustment would not apply where the defendant did not willfully provide false testimony, but instead did so as a result of confusion, mistake or faulty memory.  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  When a defendant objects to a sentence adjustment for obstruction of justice on the basis of lack of willful intent, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same."  *Taylor*, 749 F.3d at 848 (quoting *Dunnigan*, 507 U.S. at 95).

As the Supreme Court explained, the rationale for the adjustment is that "a defendant who commits a crime and then perjures [himself] in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process." *Dunnigan*, 507 U.S. at 97-98.  The obstruction adjustment does not undermine a defendant's constitutional right to testify because "a defendant's right to testify does not include the right to commit perjury." *See id.*

Ganesh engaged in three separate, but equally egregious, courses of conduct in an effort to obstruct justice in this case.  As explained below, each of these courses of conduct justifies a finding regarding her intent to obstruct justice.

A.   Ganesh's false trial testimony

On November 27, 2017, Ganesh testified as follows:

I didn't get paid since 2012, 2013. All the major insurances paid me nothing.

And then I get hit with fraud charges. I -- I still today, I don't understand that. Why? If you -- in reality, my understanding is that insurance company defrauded me out of payments, paid me nothing for all my work that I've done so far. Why is it that I'm accused of fraud when I got defrauded and then I'm accused of fraud? That didn't make any sense to me.

I worked very, very hard and I got paid nothing. They said they were going to pay me, they're going to renew the contract, and that never happened and I don't understand. I don't understand the legal system.

But if -- insurance company pay me nothing. I worked very hard, provided endless hours of patient care on Friday, Saturday, every day, and I don't get paid.

And after several years, they hit me with charges saying I committed fraud. I'm thinking, who committed fraud on who? I got defrauded out of payments for all my hard work. You hire somebody, you don't pay them for years, whatever. Then you turn them in to the police or whoever, the law enforcement.

I'm thinking, I didn't commit fraud. I never committed fraud. I worked very hard. I went above and beyond to provide the best medical care for my patients and insurance company paid me nothing for whatever excuses they had, or lame reasons why they didn't want to pay, and they cut off my contracts.

They even lured me in saying, "we'll renew your contract, keep seeing patients." And I keep working and I work – I worked -- I didn't care about the money because I was passionate about medicine. I was so passionate about patient care, I didn't care. And I'm thinking, who -- after the charges -- I was hit with these charges a year and a half ago. I was getting anxiety, panic attacks. I was very confused. I was frustrated.

How is that -- if they pay me, or overpay me, they can say I did fraud. If they never paid me, paid me nothing, how --who committed fraud on who?

Exhibit 1 (RT 11/27 at 241-42).

This testimony satisfies all of the elements necessary for a finding of obstruction of justice. It is false; Ganesh bizarrely testified that she got paid "nothing," and further testified that she didn't commit fraud, "never" committed fraud, and was defrauded herself by the insurance companies. All of these statements are false; there is no factual dispute that Ganesh was in fact paid hundreds of thousands of dollars by the insurance companies, and the ten guilty verdicts returned by the jury speak to the jury's findings regarding the falsity of her denials of having an intent to defraud. The denials are material

1  because Ganesh's testimony weighed upon the elements, specifically the scienter element in the false

2  claims, fraud, and money laundering charges.

3        Ganesh testimony was also willfully false.  Ganesh "clearly and unambiguously and under oath,

4  told a story that was simply not true, based on the totality of the evidence."  *See Taylor*, 749 F.3d at 848;

5  *see also United States v. Magana–Guerrero*, 80 F.3d 398, 400 (where defendant claimed to have

6  "forgotten" her use of prior aliases, Ninth Circuit upheld a finding of willfulness based in part on an

7  inference from the conflicting testimony of the probation officer).  Thus, she "consciously acted with the

8  purpose of obstructing justice."  *See id*.  Moreover, Ganesh cannot argue against the adjustment by

9  claiming that she was mistaken at trial.  Her denial of an intent to defraud was the centerpiece of her

10  defense throughout the trial proceedings.  Because Ganesh "defied the trial process" by perjuring herself

11  in an attempt to avoid responsibility, the two-level adjustment under U.S.S.G. § 3C1.1 should apply.

12  *See Dunnigan*, 507 U.S. at 97-98.

13        B)  Ganesh's pretrial effort to influence witnesses

14        On Thursday afternoon, September 21, 2017, approximately a month before trial, Ganesh sent an

15  e-mail out to approximately 30 recipients from her e-mail address, v.ganeshstaff@gmail.com.  The

16  subject matter of the e-mail stated, in capital letters, DOJ PROSECUTORS SLAUGHTERING

17  PHYSICIANS.   The e-mail contained a PDF attachment that consisted of a letter and a number of

18  attachments to that letter.  The text of the e-mail stated:

19           My Dear Patients, I very kindly request to review the letter.  Proof of documents please.
20           Need all of your love & support to continue to fight this highly Malicious & cruel intent
             Prosecution case & false charges.  Please feel free to offer your support, Please call or
21           contact the Prosecutors office in support of your doctor being put thro" extreme mental
             and Physical stress , during the most Difficult times, & being put thro' extreme hardship.
22           Also, You can contact the DOJ
23           office/prosecutors. In San Jose, & San Francisco

24           Please feel freee to Express your opinions & concerns..
             Thank you & I truly miss you All . . .
25           hope to see you All soon …

26           Best regards,
27           Ganesh, MD.

28

The e-mail listed the names of the assigned prosecutors and the U.S. Attorney at the bottom of the e-mail.  The e-mail also included a PDF attachment which consisted of a five-page letter from Ganesh to the American Medical Association in Chicago, Illinois, and approximately 38 pages of documents.  The letter contained a heading, in bold, stating:

> **Prosecutors Threats to "Slaughter Physicians" Along with BAD Faith acts by private Insurance Companies . . . "How a blue collar living Physician got charged with White collar crimes??"—Ganesh, MD**

In the letter, Ganesh accused the prosecution of improperly colluding with insurance companies in connection with the prosecution.  The letter specifically stated that the intent of the prosecution was to "Slaughter Dr. Ganesh," and "send a chill, a terror wave message to scare, will intimidate all of the other Physicians in the Bay Area, Northern California . . ."   The letter vacillated between vehement attacks on the motivations and integrity of the prosecution, and a litany of self-serving statements by the defendant regarding the negative impact of the prosecution upon her.  The letter concluded with a request that "immediate action be taken, Since such swift action may help prevent these type of highly malicious cruel intent prosecutions, and very unfortunately situations for all of our fellow dedicated Physicians across the nation, working very hard every day to provide outstanding patient care."  (A copy of the e-mail and the letter, without the 38 pages of attachments, is submitted as Exhibit 5 to this memorandum).

The letter was e-mailed to a list of patients which included M.K. and M.H., both of whom had been previously identified as government witnesses in the government's filed witness list (and who in fact later testified at trial).  The government sought to revoke Ganesh's bail based upon this e-mail.  Ganesh acknowledged sending the e-mail but denied doing so with knowledge that two of the government's witnesses were on the e-mail address list.  The Court declined to revoke bail, but admonished Ganesh not to engage in any additional contact with any identified government witnesses.

The clear intent of this letter was to influence possible government witnesses.  Unlawfully influencing a witness, or attempting to do so, is one of the specific examples of obstruction of justice

cited to in the application notes to U.S.S.G. § 3C1.1.  *U.S.S.G. § 3C1.1, Application Note 4.*

C) Ganesh's Efforts During Trial to Threaten and Intimidate The Victim Insurers

During the trial, Ganesh filed civil lawsuits against at least three of the victim companies in this case (Aetna, Anthem, and Blue Shield).  These lawsuits were an obvious effort to intimidate and deter the participation of the victims in the ongoing criminal prosecution, and a part of Ganesh's well-established effort to use the legal system to attack the victims of her fraudulent scheme through the filing of false and frivolous lawsuits.  Application Note  4(K) to U.S.S.G. §  3C1.1 provides that "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction" provides a basis for an obstruction of justice enhancement.  These frivolous lawsuits provide a separate basis for a finding of obstruction of justice.

For all of these reasons, the government respectfully requests that the Court impose a two-level upward adjustment for obstruction of justice.

**F.    Acceptance of Responsibility**

Ganesh has not accepted responsibility.  She went to trial, provided false testimony directly related to the elements of each offense, and after the trial, filed a motion that argued the verdict was not supported by sufficient evidence.

**G.    The Total Offense Level Should be 30**

The government respectfully submits that the guideline calculations should be as follows:

| | | |
|---|---|---|
| Base Offense: | **6** | **§ 2B1.1 (a) (2)** |
| Loss Amount: | **14** | **§ 2B1.1 (b) (1) (H)** (More than $550,000 in loss) |
| More than 10 victims: | **2** | **§ 2B1.1 (b) (2) (A)** |
| Role | **4** | **§ 3B1.1(c)** |
| Trust | **2** | **§ 3B1.3** |
| Obstruction | **2** | **§ 3C1.1** |
| **Total** | **30** | |
| **Guideline Range** | **97-121 months** | |

**III.    Section 3553(a) Factors**

The relevant Section 3553(a) factors support a sentence within the guideline range. In the

1    government's view, a sentence in the mid-range of the applicable guidelines is appropriate in

2    this case.  The government respects the recommendation of the United States Probation Office, but

3    respectfully disagrees that a downward variance from the applicable guidelines as determined by the

4    Court is an adequate sentence in this case given the severity of the conduct.

5    **A.    The Nature and Circumstances of the Offense, Including its Seriousness**

6    The defendant's scheme was an egregious ongoing fraud that lasted for years, and would likely

7    have continued without the intervention of law enforcement.  Its duration, the amount stolen from the

8    victims, and the defendant's persistent efforts to conceal and deny the scheme are all factors that weigh

9    against the defendant.  This was not a crime of opportunity; it was a deliberate effort to defraud insurers

10   over a period of years.

11   **B.    The Nature and Circumstances of the History of the Defendant**

12   Ganesh may argue that her professional history, lack of significant criminal history, and standing

13   in the community mitigate against a guideline sentence.  This would be a strained argument.  Ganesh

14   began defrauding insurers in approximately 2005, continued with the conduct for approximately a

15   decade, and would likely have continued had law enforcement not intervened.  When challenged by

16   insurers or employees, she reacted by retaliating against them.  She fired Landis and has recently filed

17   civil lawsuits against victim insurers.  While she doubtless enjoyed a positive relationship with some of

18   her patients, it is clear that her practice was riddled with fraud, and her conduct betrayed the trust of her

19   patients.

20   **C.    Deterrence**

21   Ganesh presents a risk of recidivism.  She has indicated no remorse and continues to insist that

22   her billing practices were legitimate.  She has consistently blamed others for her legal problems,

23   including the victims of her crimes, her staff, Dr. DeWees, and her legal counsel.  Without any

24   indication of remorse or an acceptance of responsibility, the government assumes she intends to return to

25   her practice, and assumes that she will continue to defraud insurers.  Additionally, Ganesh has continued

26   to attempt to bully witnesses (by suing them) and blame her trial counsel (by suing him), all of which

27   indicates that a guideline sentence is necessary to deter future efforts to defraud and victimize members

28   of her community.

IV.     **Restitution**

The government respectfully requests that the Court enter an order of restitution in the amount of $688,698, with the restitution apportioned as follows:

Anthem                          $671,771

Blue Shield/Blue Cross          $15,582

Aetna                           $1,150

Cigna                           $196

V.     **Conclusion**

Ganesh's sentence should reflect the totality of her conduct.  It should also reflect, rather than reward, her continual efforts to avoid responsibility and blame others for her criminal behavior.  The government respectfully requests that the Court impose a mid-range guideline sentence of 108 months imprisonment as an appropriate sentence in this case.


DATED: July 17, 2018                          Respectfully submitted,

                                              ALEX G. TSE
                                              Acting United States Attorney

                                              /s/
                                              JEFFREY NEDROW
                                              PATRICK R. DELAHUNTY
                                              Assistant United States Attorneys

CERTIFICATE OF SERVICE
U.S. vs VILASINI GANESH
No. CR 16-00211 LHK

I, Susan Kreider, declare that I am a citizen of the United States, over the age of 18 years and not a party to the within action.

I hereby certify that a copy of the foregoing:

UNITED STATES' SENTENCING MEMORANDUM EXHIBITS 6, 7, and 8.
UNITED STATES' SEALING APPLICATION AND PROPOSED ORDER AS TO
EXHIBITS 6, 7, AND 8 TO GOVERNMENT'S SENTENCING MEMORANDUM,
DECLARATION OF PATRICK R. DELAHUNTY, and SEALING ORDER

was served today___ by hand; ___by facsimile; _x__by Federal Express; ___ by first class mail by placing a true copy of each such document(s) in a sealed envelope with postage thereon fully paid, either in a U.S. Mail mailbox or in the designated area for outgoing U.S. Mail in accordance with the normal practice of the United States Attorney's Office; ___ by placing in the U.S. Public Defender's pickup box located in the District Court Clerk's Office;  and addressed to:

Wm Michael Whelan, Jr.
95 South Market Street, Suite 300
San Jose, CA 95113

I declare under penalty of perjury that the foregoing is true and correct, and that this certificate was executed at San Jose, California.

DATED: July 18, 2018


/s/_____
SUSAN KREIDER
U.S. Attorney's Office

SENTENCING MEMORANDUM RE GANESH
 CASE NO. 16-CR-211 LHK                    20