# ARGUEDAS, CASSMAN & HEADLEY, LLP

Law Offices

803 Hearst Avenue, Berkeley, California 94710
Phone: (510) 845-3000   Fax: (510) 845-3003
www.achlaw.com

Cristina C. Arguedas
Ted W. Cassman
Laurel L. Headley
Julie A. Salamon
Raphael M. Goldman

Of Counsel:
Christy H. Chandler

March 15, 2018

Kyle Pollak
U.S. Probation Officer
Northern District of California
280 South First Street, Suite 106
San Jose, CA 95113

> **RE:   United States v. Vilasini Ganesh,**
> **No. 16-CR-211 LHK**

Dear Kyle:

I write to you to give you some additional background and context relating to Dr. Vilasni Ganesh in anticipation of the draft PSR in the above-referenced matter.

As you know, Vilasni was born and grew up in Madras (now called Chennai), India. Both of her parents were worked. Her mother was a hospital Nurse. Her father was a senior Police Officer and was a man of great integrity in a society where corruption was rampant. Growing up as a child, Vilasni was very timid and protected. She was rarely allowed to leave the home except to attend school, and when she did go out she was always escorted by someone. She was especially close to her father: they routinely went jogging together; he helped her with her studies, and he aspired for Vilasni to become a doctor. He meant everything to her.

In 1988, Vilasni's father died tragically in a car accident while on duty when Vilasni was 17 years old. This was a terrible blow from which Vilasni has never recovered. As you observed, to this day Vilasni cannot speak about the loss of her father without visible emotion. Not long after his death, Vilasni entered medical school, fulfilling her father's dream. Vilasni was and is absolutely passionate about the practice of medicine.

A couple years after Vilasni's father died, her mother decided to pick up pieces and move to the U.S. Vilasni followed in 1993, after graduating from medical school. Her bother also immigrated. She married Raja Malyala, M.D. in 1994, in a traditional arrangement. From 1993 to 1999, Vilasni lived in Toledo, Ohio and worked as a research assistant in cancer research, while also studying to pass the American Board exams so she could practice medicine in the U.S. After passing her Boards in 2002, Vilasni did her residency at Rush University Hospital in Chicago.

Vilasni and Raja had two children together, Ram who is now 19 and Prashant who is now 17. Vilasni and Raja moved to Fremont, California in 2003. Raja, who was also a

physician, preferred to be close to his family in the Chicago area, so he took a job back there. He and Vilasni lived separately for a couple of years, grew apart and eventually divorced in 2005.

For approximately a year, Vilasni worked as a roving, temporary doctor for an agency. In 2004, she joined the practice of Kuhlman, Riley and Dewees, M.D., primarily under the supervision Edward C. Dewees, M.D. In 2004, Vilasni also met Greg Belcher. They fell in love and moved in together in 2005. Their first child, Raymond, was born in 2007, followed by Rea in 2008. Sadly, this proved to be turning point. Vilasni suffered from severe postpartum depression after Rea's birth that exacerbated other mental and emotional issues (discussed below) that she had adequately managed throughout her life till then. There were a second postpartum episode with the birth of David (2009). Vilasni and Greg are loving, devoted parents. Greg, in fact, is like a second father to Vilasni's older children. The children are thriving.

In 2006, Vilasni purchased Dr. Dewees' practice and their roles were essentially reversed – the older doctor was now an employee of his younger protégé. Vilasni has little if any business sense. By all accounts, she was essentially incompetent as a manager and administrator. She soldiered through the first two years of the practice, still with Dr. Dewees' guidance; but by 2010, Vilasni had lost all semblance of control at her office: she was always running hours late, she was constantly moving from crisis to crisis while berating staff loudly and often unprofessionally, her conduct and speech were often inappropriate and, most relevant here, her billing system was a disaster.

There can be no doubt that Vilasni's legal issues and her apparent inability to conform her conduct to the demands of her profession stemmed in part from her deep seated mental, cognitive and emotional impairments. Her treating psychiatrist, Dr. Douglas Levinson, has diagnosed her with bipolar disorder, panic disorder and depression with unspecified cognitive impairments. (Dr. Glezer, the government's expert who testified at trial, conceded the diagnosis of panic disorder and noted evidence of cognitive impairment, but opined that she could not confirm a bi-polar disorder diagnosis.) She is being treated with Lithium. Quite simply, her judgment is severely impaired. Her brother and mother confirm that Vilasni has struggled with these issues her entire life, and that they became strikingly more pronounced after her episodes of post partem began in 2008. This decline coincided with the onset of the conduct that brings her before the court.

In retrospect, given her lifelong cognitive issues, the very fact that Vilasni completed medical school and passed her Boards is a remarkable accomplishment. Those achievements speak to her father's inspiration, her great passion for medicine, her indomitable spirit and her commitment to hard work. But it is also clear that her impairments have become more pronounced and disabling over the years since the birth of her third child. These observations are borne out and fully supported by the reports of her family members (as documented in the trial transcripts) and by the evaluations of Dr. Howard Friedman, a neuropsychologist who evaluated Vilasni in July 2017, and of Dr. Levinson, her treating psychiatrist.

The loss of her medical license will be a profound sanction for Vilasni.  A separation from her family would be even more devastating.  Even more than the practice of medicine, Vilasni's children are her greatest passion.  They are the love of her life. Obviously, ages 7 ½ to 19, the children need their mother.

I enclose copies of several of Dr. Friedman's initial report and a short supplement. (Exhibit A.)  I am in the process of obtaining Dr. Levinson's report(s) and will forward to you as soon I have them.  Both doctors testified at trial.  Let me know if you would like me to forward copies of the transcripts.

I look forward to speaking with you in the very near future.  Thank you for your attention to these matters.

Very truly yours,

Ted W. Cassman

cc:    AUSA Patrick Delahunty

# EXHIBIT A

## HOWARD J. FRIEDMAN, PH.D., ABPP
### CLINICAL NEUROPSYCHOLOGY

DIPLOMATES
AMERICAN BOARD OF CLINICAL NEUROPSYCHOLOGY
AMERICAN BOARD OF PROFESSIONAL NEUROPSYCHOLOGY
CA Lic. PSY 7986; NM Lic. 733

1855 SAN MIGUEL DR., SUITE 23
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: (925) 933-5594
FAX: (925) 933-0679

July 5, 2017

## NEUROPSYCHOLOGICAL EVALUATION

NAME:          Vilashi Ganesh, M.D.
AGE:           44 (DOB:  9/18/72)

DATE OF
EVALUATION:    6/26/17

REFERRAL:  Dr. Ganesh was referred by Douglas F. Levinson, M.D. for evaluation of current cognitive and emotional functioning.  There is concern as to history of Atypical Bipolar Disorder as well as questions regarding cognitive function as might be associated with problems that have occurred in management of her practice.  These problems have resulted in legal charges against her.

Information was provided with the referral. It was stated that she had tentatively been diagnosed with an Atypical Bipolar Disorder and was being treated with Lamictal.  There were panic attacks and generalized anxiety.  She was described as being disorganized in her conversation and daily life.  Despite this, she was practicing medicine including hospital based practice without complaint about her performance.  She was noted to have a form of dyskinesia with sticking out her tongue repeatedly on an involuntary basis.  It was noted that she needed emotional support through medical school.  She has been unable to readily grasp the extent of her legal difficulties and the implications of her legal problems.

## TESTS ADMINISTERED

Green's Word Memory Test
The b Test
Wechsler Adult Intelligence Scale-IV
California Verbal Learning Test-II
Wechsler Memory Scale-IV
Stroop Color and Word Test
Ruff 2 & 7 Selective Attention Test
Wide Range Achievement Test-4 (selected subtests)
Trail Making Parts A and B
Controlled Word Association Test
Judgment of Line Orientation
Rey Complex Figure
Wisconsin Card Sorting Test
Tower of London
Minnesota Multiphasic Personality Inventory-2-RF
Rorschach Performance Assessment System

BACKGROUND INFORMATION

Identifying Information.  Dr. Ganesh is a 44-year-old woman who currently resides in Saratoga. She functions professionally as a physician.  She noted she was of Indian background.  She arrived almost 30 minutes late and had called in advance to indicate that she had unanticipated traffic.

Current Status.  Dr. Ganesh reported how she had first gone into treatment with Dr. Levinson about one year ago.  This is because of having anxiety and panic attacks.  She was nervous about everything.  She could not get out of bed and had no energy.  She felt mentally paralyzed at that time.  This is in contrast to always having been a person who could "suck it up".  With talking with Dr. Levinson she realized that her panic problems had been present on a long-term basis. However, she had always been ambitious and motivated.  She never took time off.  She felt it was her duty to care for patients and family.  She described her life as always having been on a fast track.  Finding problems and trying to work out solutions would simply make her life worse.

She acknowledged she had long-term anxiety since she was a teenager.  It began about age 14 or 15.  It was at the point when her father had died.

She explained about her father's death.  She stated that her father had been killed.  Since then she has anxiety and panic.  She stated the family had initially been told that her father had died in a motor vehicle accident.  However, they came to find out that there had been a plot to kill him, and the belief on the family's part is that the accident was fabricated to cover up him having been killed.

This has had consequences for her.  She has been afraid to go out with friends.  Even with that she was able to focus on reading and would tend to stay at home with reading.  She was afraid something would get to her and harm her like what happened to her father.  Her mother was always present at home and somewhat protective of her.  This is because her mother knew that she was fragile.  She described herself as having been afraid to make friends and afraid of the dark.  She stated that she still has fears of meeting people especially strangers.  She is uncomfortable going out.  When she does go out and is in a social situation, after about one hour she becomes anxious and goes home.

She was asked about issues relating to the description of her having a Bipolar Disorder.  She described that her mother reported that she would call and yell at her mother.  She would yell things such as "You don't care about me.  You want me to go away".  She stated she had no memory of these episodes.  However, her mother recorded this about how she would scream at her mother and then not remember.

She had episodes of not sleeping and, instead, staying up through the night.  During these periods she would be cleaning, doing paperwork and reading.  She would often get anxious if she was not doing something, and she would manage anxiety by obsessively reading textbooks.  She was always scared with the idea of being idle.  Her father would say that "Idle hands are the devil's workshop".  She was afraid that if she was idle her mind would turn into the devil.

She also acknowledged a number of other symptoms.  In addition to being irritable and argumentative, as well as needing less sleep than usual, she described herself as more talkative and speaking faster than usual.  She would have thoughts race through her mind and not be able

to slow down. She can be distracted by things around her with difficulty in concentrating and staying on track. She also sees herself as more active and doing more things than usual. She describes this as moderate to severe in creating problems. All of this is consistent with hypomanic features.

She was asked about her legal issues. She stated this occurred between 2015 and 2016. During that time period she was focused on patient care. She talked about having no experience with administration of private practice and billing. She explained that in 2004 she had bought her practice. She had first worked in urgent care. She then was in a group practice. She had no formal training in billing. She talked about the difficulty of billing in a primary care setting. She described this as more difficult than billing compared to a specialty practice because of the large number of procedural codes to utilize. She went into a lengthy discussion in talking about billing services. She stated that billing services advised her to do billing within the office or to join a group that could provide the billing for her. She stated that billing services indicated that there was not adequate profit for them to handle billing of a primary care practice with a solo provider. It was necessary to focus her on the question that was posed to her. However, she was not able to answer this. She then began talking about utilizing the billing template which had been used by the office that she had purchased. She then began talking about insurance contracts being terminated, such as by Blue Cross/Anthem. Claims were being turned down. Her staff kept resubmitting claims. Supposedly, she was told by the insurance companies to refax the claims. Ninety percent of her claims, though, were rejected, such as on the basis of the contract having been terminated. This had been going on for about two years. She talked about how she was terrified of malpractice suits regarding patient care, and this was her sole focus.

Between 2009 and 2010 she had other staff, such as nurse practitioners and loco physicians. She had to let them go with income and reimbursement dropping. By 2015 there was a billing fraud case because of the office refaxing thousands of claims. She stated that she did not put it together because she was simply working hard, and she had little recognition that her income was low. She was told this by her accountant that she was low compared to other primary practice physicians.

She stated that before the fraud case came along she talked to California Medical Association. She was told she had a problem about having two tax ID's regarding the older practice and her current one. She stated that this was possibly a reason why she was having claim reimbursement problems.

She acknowledged that in 2013 she had a faxed letter from Aetna about being terminated, but she stated this letter indicated she was terminated erroneously and that she would be reinstated. However, this never occurred.

She acknowledged that nobody was assigned to look into the billing problems within the office. She was completely focused on the large number of patients she had per day.

She stated that she obtained legal consultation about the non-payment of claims, and she was told to file some complaint about payments not being made within a 60 day period. It was after that that billing fraud charges were brought against her, and she has a belief that the charges evolved out of the insurance companies using this as an attempt to evade payment.

She acknowledges that the insurance fraud charge has been brought by the U.S. Attorney's Office. She has been advised by her current attorney that she has faxed claims too many times. She did not know that resubmitting the same bill was illegal. She also stated that she did not know any details about what is called a "false claim".

She went into some explanation about finances. She stated that in 2011 and 2012 she had no payments from Blue Cross. Her total income per year over a five year period was less than $100,000.

She stated she has no understanding of the legal situation. She does not know what consequences she might face regarding her charges. She, at first, said that she has never had any legal problems, not even a speeding ticket. She then commented that she had just written a check for a speeding ticket.

In asking her more about her legal situation she had no understanding of, again, the consequences that she might face. She stated she is unable to understand advice from her attorney. Her brother and her husband are intervening to talk to the attorney and interpret information for her in that she cannot understand the legal issues.

She, again, talked about her not following what was going on with the administrative or financial aspects of her practice. She did not have time to follow through, such as with advice of joining a group. She did get some consultation for her staff about billing. She obtained training regarding billing from a billing service for the staff, and that service provided software for her office to use in 2008. She stated, though, that her staff was told to contact an insurance claims office about claims being denied. They were then told to resubmit the claims. Her belief is that the development of her problem related to the disconnect with the claims offices being outsourced overseas.

She was asked about the changes that she has instituted in her office procedures. She has now turned over billing to a company. The current company was on referral from the county medical association. She is now using Metro Medical Billing Service. This company was willing to take her on even though she has a primary care practice in that they had an opening and that the referral was made by the medical association. She still maintains that she does not know about coding for procedures. She leaves it up to the company to look at her patient notes and to bill the correct codes.

Medical History. She indicated that while her mother was pregnant with her that her mother experienced pre-eclampsia. Her mother had lost weight. There was also Rh incompatibility between what she described as her mother and father. Reportedly, her mother was in the hospital for about seven months during the pregnancy.

Dr. Ganesh was born prematurely and stated that she had IUGR as a baby. She had low birth weight. She was in the newborn ICU for several weeks. Her mother also experienced postpartum illness and continuing pre-eclampsia.

Dr. Ganesh stated that she experienced febrile seizures through infancy up to the age of 5-6 years. She was initially treated with sedatives up until that age. The seizure frequency decreased and then it ceased.

Regarding early development, she thought there was a delay, but she was not sure about specifics. She indicated that her mother had reported slow development regarding speech and walking. However, by the time she started school there were no motor or coordination issues. Her mother got her into dance and vocal music lessons in order to address coordination and voice production.

Prior medications have included thyroid medication for hypothyroidism. She also takes various vitamins including B12 because of low iron relating to vegetarian diet. She had also reported prior use of Phentermine but did not specify when this was.

She was recently started on treatment with Lamictal by Dr. Levinson with 25 mg. in the morning and 50 mg. in the evening. With this treatment she does not have as severe panic attacks. She can sleep better for the first time. Previously, she was having thoughts going on a non-stop basis as she would be worried about things that she had to do.

Educational Background. She stated she had no history of school problems. She stated, though, that her math skills were average or below. She was good with memorization, but the problems with math lowered her GPA. She stated that she barely passed her math classes.

She completed medical school prerequisites while she was living in India. With moving to the United States she finished medical school at age 21-22.

She indicated that through medical school she was experiencing anxiety. Her mother was living with her to provide emotional support.

Social History. Dr. Ganesh was born in India. They immigrated to the U.S. after her father's death.

She has been married since 2009 to her second husband. Her first marriage was in 1996. She has two children from that marriage. She indicated that her first husband was a research fellow at the time. It was an arranged marriage, and they eventually grew apart. With the second marriage she has three children.

On a professional basis her first goal was to go into a plastic surgery specialty. However, she decided that there was too much stress regarding surgery training. She changed to family practice and did residency at Rush Medical Center.

BEHAVIORAL OBSERVATIONS

Dr. Ganesh was comfortable with the evaluation process. She acknowledged an understanding of the nature of the evaluation. She did not display physical agitation. Her speech was rapid, although not pressured. She was quite perseverative in her discussion as she would continue to talk about specific topics such as the pressure of her private practice, number of patients she had to juggle and her sense of being overwhelmed with professional issues. It was pointed out to her that she was perseverating about this, and she was surprised in a manner that seemed to indicate lack of awareness or comprehension. Perseverative tendencies were also noted within test performance as she was unable to utilize feedback to make adjustments. Mood and affect were cheerful but not overtly buoyant. Her affect was not appropriate to the circumstances particularly when she was being asked about her legal difficulties. There was lack of

comprehension regarding her legal situation and, again, being somewhat surprised and dumbfounded when details were explained to her. No gross disturbance was seen in thought processes, but there was lack of active thinking in formulating conclusions.

REVIEW OF RECORDS

*Anna Glezer, M.D.* 6/19/17: This was a psychiatric evaluation conducted at the request of the US Attorney. Opinions were summarized at the outset of the report. She was diagnosed as meeting criteria for Panic Disorder and Mood Disorder, Not Otherwise Specified. The Panic Disorder was associated with history of panic attacks, including anxiety, racing thoughts, nausea with occasional vomiting, diarrhea, heart palpitations, difficulty breathing and inability to focus/concentrate during the episodes. Her movement has been restricted with driving only near her home. The Mood Disorder was described in that there was not sufficient information to specifically determine if there was a Major Depression or Bipolar Disorder. There were symptoms consistent with depression, such as difficulty with motivation, low mood and impaired sleep, appetite and concentration. She also described postpartum worsening of the symptoms. Additionally, there were episodes of anger and range, which she could not directly remember. It was noted this could be a function of hypomania characteristic of Bipolar Type II. It was also thought it could be a function of a Personality Disorder, such as borderline elements. It was noted that she had responded to treatment with Lamotrigine which could address bipolar as well as borderline symptoms. It was noted that during the evaluation she displayed histrionic features and labile affect with at times crying with her head in her hands and needing to be redirected back to topic.

It was noted there were medical components to her presentation. This included hypothyroidism diagnosed in 2007 and managed with medication. She also reported the use of stimulant medication, that is, Phentermine, used for weight loss.

Her current status and psychiatric history were described. It was noted that currently she was having difficulty with sleep, particularly falling asleep. This was an ongoing issue over many years associated with anxiety and worry. Recent medication had helped with this. However, she continued to have anxiety/panic attacks when she had to go to court. This included gastrointestinal distress and difficulty paying attention in the room. She would defer all legal decisions to her husband or brother. She is having nightmares and avoiding dark places at night with a fear that someone was watching her, and she had a need to check her locks. She reported that she had had suicidal ideation and might have committed suicide a long time ago if it were not for her children.

She indicated that anxiety and panic began as a teenager. This was around the time of her father being killed. There was discussion of her reporting different stories about this. However, it was clarified in this evaluation.

She first developed symptoms postpartum following the birth of her second child. This included tearfulness. With the second child she had anxiety, postpartum and depression with suicidal thoughts following the birth of the third child. At that time she was diagnosed with hypothyroidism. She continued to have emotional reaction after the subsequent child being born and with the last one becoming irritable and angry. She began current psychiatric treatment after having had, what she described as, a nervous breakdown including racing heart and panic attacks along with not being able to get out of bed. Symptoms worsened after she was arrested in May,

2016.  She had a panic attack and became incontinent of urine.  She had again expressed suicidal ideation.

It was noted that in her current psychiatric treatment she is being treated with Lamotrigine and she was diagnosed with a possible rapid cycling Bipolar Disorder Type II and Panic Disorder.  It was noted within the current treatment she was described as not being able to confront clearly her legal situation.

Description of the instant offence, according to Dr. Ganesh, was reviewed. This was in the context of an assessment of her sanity.  Dr. Ganesh stated that she was being falsely accused of billing fraud because of her belief that if you do the work it is not fraud.  She was apparently confused with federal agents that came to her office thinking that they were investigating something related to construction issues at her home.  She was unable to comprehend what it meant to be charged with a white collar crime.  She was also unable to comprehend being charged in that she saw herself as a victim.

A section of the report dealt with assessment of competency.  She was unable to state potential pleas that somebody might enter in court.  She could not define terms, such as *guilty* or *not guilty*.  She could not provide details about other terms, such as probation.  She had difficulty explaining the roles of various courtroom participants.  She was also unable to describe how she would work with her defense attorney in a rational manner as she turned over her responsibilities to her brother.

Some formal testing was conducted.  This included Miller Forensic Assessment of Symptoms Test.  She was at a cutoff level for malingering, suggesting some possible exaggeration of her psychiatric presentation.  This included endorsing hearing voices.  However, with questioning she thought that she was hearing her neighbors talking.  This would get her scared, and she would check the locks.

The MMPI-2 was also administered.  It was noted that her responses created an invalid profile with overreporting of current problems.  It was also noted that it took her an extended time to answer the questions, and she had difficulties with maintaining focus.

Concern was raised about whether she was consciously or unconsciously exaggerating her symptoms.  Further testing was not done to elucidate information about this.  It was suggested that there was discrepancy in her self-report about history, such as around her father's death. This was clarified in the context of this evaluation.

TEST RESULTS (All tests are scored on the following basis):

| Standard Score | %ile | Description |
|---|---|---|
| >130 | >/= 98 | Very Superior |
| 120-129 | 91-97 | Superior |
| 110-119 | 75-90 | High Average |
| 90-109 | 25-73 | Average |
| 85-89 | 16-23 | Low Average |
| 78-84 | 7-14 | Borderline-Low Average/Mildly Impaired |
| 70-77 | 2-6 | Borderline/Mildly-Moderately Impaired |
| 62-69 | 1-2 | Moderately Impaired |

| 55-61 | 0.3-0.9 | Moderately-Severely Impaired |
| <54 | <0.2 | Severely Impaired |

<u>Test Validity</u>.  A measure of validity of performance was Green's Word Memory Test.  She had the following scores:

| Subtest | Percent | Description |
|---|---|---|
| Immediate Recognition | 100.0 | Pass |
| Delayed Recognition | 97.5 | Pass |
| Consistency | 97.5 | Pass |
| Multiple Choice | 65.0 | --- |
| Paired Associates | 75.0 | --- |
| Free Recall | 52.5 | --- |
| Long Delay Free Recall | 70.0 | --- |

Her performance across primary measures is consistent with valid effort and counter to exaggeration of impairment.

The b Test was also utilized.  She had an E-score of 94, which is within normal limits for relevant comparison group.  This, again, would be indicative of lack of exaggeration of impairment.

Effort was determined with Reliable Digit Span derived from the Digit Span subtest of the WAIS-IV.  She had an RDS of 10, which is within normal limits and counter to an indication of exaggerated impairment.

Effort was also determined with the Rey Complex Figure.  She had an E-score of 54, which is, again, within normal limits and counter to an indication of exaggeration of impairment.

<u>Intellectual Functioning</u>.  Current intellectual functioning was determined with the WAIS-IV.  On an age adjusted basis she had the following scores:

| Index | Standard Score | Percentile | Description |
|---|---|---|---|
| Verbal Comprehension Index | 96 | 39 | Average |
| Perceptual Reasoning Index | 77 | 6 | Borderline/Mildly-Moderately Imp. |
| Working Memory Index | 83 | 13 | Low Average/Mildly Impaired |
| Processing Speed Index | 81 | 10 | Low Average/Mildly Impaired |
| Full Scale IQ | 81 | 10 | Low Average/Mildly Impaired |
| General Ability Index | 84 | 14 | Low Average/Mildly Impaired |

Her scores were also calculated on a demographic basis which included adjustment for education.  Considering educational level, she had the following scores:

| Index | Standard Score | Percentile | Description |
|---|---|---|---|
| Verbal Comprehension Index | 73 | 4 | Mildly-Moderately Impaired |
| Perceptual Reasoning Index | 66 | 1 | Moderately Impaired |
| Working Memory Index | 69 | 2 | Moderately Impaired |
| Processing Speed Index | 73 | 4 | Mildly-Moderately Impaired |
| Full Scale IQ | 63 | 0.6 | Moderately Impaired |

Her scaled scores on the individual subtests on simply an age adjusted basis (with a mean of ten and a standard deviation of three) are shown below:

| Index | Scaled Score | Percentile |
|---|---|---|
| Verbal Comprehension | | |
| Similarities | 8 | 25 |
| Vocabulary | 9 | 37 |
| Information | 11 | 63 |
| Perceptual Reasoning | | |
| Block Design | 7 | 16 |
| Matrix Reasoning | 6 | 9 |
| Visual Puzzles | 5 | 5 |
| Working Memory | | |
| Digit Span | 7 | 16 |
| Arithmetic | 7 | 16 |
| Processing Speed | | |
| Symbol Search | 7 | 16 |
| Coding | 6 | 9 |

Within a verbal area basic abilities would appear to be at an average level given the extent of vocabulary and general knowledge that she has acquired. Again, this is simply on an age adjusted basis. When education is also considered, her vocabulary level, which would relate to communication capacity, is mildly to moderately impaired. She is just within an average range with reasoning in determining verbal relationships. However, when education is also considered, she is mildly to moderately impaired (2nd %ile).

Attention and concentration measures are low average on an age adjusted basis as seen with her ability to calculate mental arithmetic problems or repeat strings of numbers (seven forward, three backward, four sequential). Again, with considering educational level these scores are mildly to moderately impaired.

Similar issues are seen with processing speed. She is mildly impaired/at a low average level on an age adjusted basis but her performance drops with consideration as to education. Thus, she is slow as well as unable to maintain applied concentration.

Impairment is further noted with visual-spatial abilities. She is unable to readily construct designs, thereby, solving problems utilizing blocks. She is impaired with her ability to use nonverbal reasoning in determining spatial relationships or to organize abstract puzzle pieces.

Visual-Spatial Abilities. Basic visual-spatial processing was determined with the Judgment of Line Orientation Test in which she had to determine the direction of depicted lines. She had only 16 of 30 items correct which placed her in a mildly to moderately impaired range (4th %ile).

Visual-spatial construction and organizational skills were determined with her copying the Rey Complex Figure. She could not accurately plan how to approach this as she did not initially draw the central portion of the figure. She also had difficulty with accurate placement of details, and she scored only 27 out of 36 points, placing her in a severely impaired range (<1st %ile).

Verbal Abilities. Elements of verbal functioning were determined with portions of the WRAT-4.

Her reading comprehension was at a low average/mildly impaired level (standard score 80, 9th %ile). This related to her reading simple sentences and filling in missing words.

Math calculation skills were also at a low average/mildly impaired level (standard score 81, 10th %ile). She had difficulty with tasks involving fractions, multiplication and division, and even confused the correct arithmetic operation.

Attentional Processing. Processing speed and multitasking were determined with the Trail Making Test in which she had to sequence numbers or alternately numbers and letters. She completed the first portion in 48 seconds with no errors. However, her speed placed her in a moderately impaired range (standard score 64, 1st %ile). The second portion was completed in 123 seconds with no errors, but she was, again, moderately impaired (standard score 63, 1st %ile).

A measure of selective attention was the Stroop Color and Word Test in which she had to initially read names of colors. On subsequent trials she had to identify ink in which a series of X's was printed, and on a third trial she had to ignore the printed word and, instead, attend to the contrasting color of ink. She had the following scores:

| Subtest | Standard Score | Percentile | Description |
|---|---|---|---|
| Word Score | 60 | 0.8 | Moderately-Severely Impaired |
| Color Score | 50 | .07 | Severely Impaired |
| Color Word Score | 46 | 0.3 | Severely Impaired |
| Interference | 78 | 7 | Mildly Impaired |

She was consistently impaired with her speed of performance, and she also displayed interference on the distraction measure. She was slow with basic processing but also unable to screen out an automatic response in the face of a competing response.

Another measure of selective attention was the Ruff 2 & 7 Test in which she had to cross out those numbers interspersed in an array of other numbers or letters. Overall speed was at the lower end of an average range (standard score 90, 25th %ile). This was significantly lower than accuracy, which was at the mid-range of average (standard score 100, 50th %ile).

Memory Functioning. Elements of verbal memory were determined with portions of the WMS-IV in which she had to learn a story. On an immediate basis she was in an average range (scaled score 9, 37th %ile). After a delay period she remained average (scaled score 10, 50th %ile). When educational level was also considered, though, her immediate recall was at a low average level (standard score 86, 18th %ile). She remained average with delayed recall.

Another measure of verbal memory was the CVLT-II in which she had to learn a word list presented over a series of trials. Initial learning was average, and her total learning over the five presentations was average (standard score 100, 50th %ile). She was average with her recall over short or long delay periods. Again, this is lower than would be expected given her level of education. There were also difficulties with executive functioning in that there was a heightened number of repetitions of items she had already stated (5 standard deviations above average) as well as intrusions of extraneous details (2.5 standard deviations above average). Thus, she was not able to remain consistently focused on information that she was processing.

Visual memory was determined with recall of designs from the WMS-IV. On an immediate basis she was mildly to moderately impaired (scaled score 5, 5th %ile). She retained a substantial amount of the information after a delay period and was just within an average range (scaled score 8, 25th %ile). However, with educational adjustment these scores dropped to a moderately to severely impaired level with immediate recall (0.5 %ile) and low average level with delay (16th %ile).

Visual memory was also determined with her recall of the Rey Figure that she had previously copied. On an immediate basis she scored only 6 out of 36 points and after a delay period 8 of 36 points. Both of these placed her in a severely impaired range (standard score <55, <1st %ile). Recognition was also impaired as she correctly identified only 17 of 24 details (standard score 66, 1st %ile).

Concept Formation and Executive Functioning. A measure of conceptual abilities was the Wisconsin Card Sorting Test in which she had to sort cards according to strategies that she had to discern using examiner feedback. She developed only four correct categories and overall performance placed her in a moderately impaired range (standard score 66, 1st %ile). She tended to perseverate with repeating outdated solutions. Despite ongoing feedback, she was unable to readily adjust and on this basis was mildly to moderately impaired (standard score 72, 3rd %ile).

A measure of problem solving was the Tower of London in which she had to arrange beads to match depicted examples. She solved only two of the designs at a minimum number of moves, and her overall performance, based on total moves, was low average (standard score 88, 21st %ile). An added concern was that she was impulsive and violated rules under time pressure of trying to initially solve the problems. Additionally, her problem solving was mildly impaired in terms of speed of completion (standard score 84, 14th %ile). Thus, she was both slow and inefficient in solution development.

Mental flexibility was also determined with a verbal fluency measure. In generating words beginning with particular target categories she produced only 35 items which was mildly impaired (standard score 80, 9th %ile).

Emotional Functioning. Similar to a previous evaluation on the MMPI-2-RF she overreported difficulties leading to elevations on validity scales. Specific clinical scales were, thus, not interpretable as she endorsed most problems in a positive direction. There appeared to be little evaluation process on her part.

Projective testing was also done with the Rorschach Inkblot Test. This was not subject to overreporting patterns, and she provided a valid test record. Results indicate that she has minimal ability to think through solutions to problems. Instead, there is an emotional reactivity

without the ability to temper her behavior by deliberation. A significant problem is seen with her capacity to think and plan. Reality testing is severely compromised as she frequently evaluates information in an inaccurate and distorted manner. Even with the poor information gathering she then has further misinterpretation as inappropriate conclusions are developed. This is in line with a disturbance in thought processes. The disturbance in her thinking appears to be secondary to significant mood disorder. There are prominent features of depression with morbid ideation and self-critical feelings.

CONCLUSIONS

Dr. Ganesh was evaluated for cognitive and emotional functioning. This is in relationship to clinical issues involving bipolar features as well as anxiety and panic attacks. In addition, there is concern about her functioning in relationship to the behavior that resulted in legal charges against her.

On a cognitive basis she displays significant impairment. She is generally functioning in a moderately impaired range particularly when it is considered that she has an advanced degree. Overall intellectual abilities are moderately impaired (0.6th %ile). Impairment is seen throughout much of her functioning. She is unable to readily communicate at a level commensurate with her education. Her ability to acquire information through reading is impaired, and she is also impaired with her capacity to carry out calculations even on paper. Simple and complex attention are also impaired. She is not able to screen out irrelevant information, and she generally processes information slowly. She is further impaired with her capacity to plan and organize and even has difficulty with simple visual-spatial analysis. Executive functioning is similarly impaired. She is not able to deduce concepts even with ongoing feedback. Instead, she is slow and inefficient with problem solving as well as tending to perseverate without outdated solutions. Essentially, she keeps repeating a pattern despite ongoing feedback that she should make an adjustment. This would certainly have relevance to her behavior resulting in legal charges as she was described as continuing to repeat patterns and not able to make adjustment.

None of these difficulties are associated with exaggeration. She was given a number of measures of validity of performance and she passed them all. Thus, her current presentation is an accurate representative of her cognitive abilities at this time. By her report, she was able to manage her medical practice by doing more of a checklist type of approach and readily referring out to specialists when any questions arose.

On an emotional basis there is an indication of a history of hypomanic behavior as well as depression, anxiety and panic attacks. Results are consistent with her having Bipolar II Disorder as well as Panic Disorder. There is a tendency for her to overreport difficulties on the MMPI-2, and this pattern was seen in a previous evaluation. This appears to be associated with lack of judgment on her part as she would tend to endorse any specific problem presented to her in the context of the test. This is despite a lack of awareness or capacity to reflect on her behavior within the interview.

The difficulties associated with mood disorder are evident with projective testing. There is no indication of exaggeration or manipulation of her presentation as this approach analyzes her functioning in a different manner than the MMPI-2-RF. There are evident difficulties with mood particularly with underlying depression. This contributes to disturbance in her thinking. She is unable to judge information accurately, and her thought processes are, consequently,

disorganized.  This amounts to a psychotic level of disturbance with her thinking.  This would certainly be consistent with the observed disorganization in her presentation.

Her overall functioning has implications for her behavior associated with her legal situation as well as her capacity to manage a medical practice.  There is not a clear etiology as to the underlying cause of the cognitive impairment.  It is beyond what would be expected from the Bipolar Disorder.  Obviously, she had been functioning well historically to have gone through her education and training.  However, there is now indication of significant impairment in her cognitive abilities.   The perseverative tendencies and impaired reasoning evident in this evaluation are likely associated with the poor executive functioning and management that she displayed with her medical practice and billing procedures.  She is not able to exercise reasoning and judgment on an effective basis.   This even applies to not even fully understanding consequences of her actions and implication of her current legal situation.  She does not display a level of functioning that would enable her to develop an understanding of practice management procedures.  This is even down to the fact that she becomes confused with arithmetic operations. Her current level of functioning would certainly have precluded her from developing or maintaining an adequate practice management/billing system.

There is, of course, implication for her capacity to practice medicine given her current limitations.  I do not believe that she could be presumed to be able to safely practice medicine given this level of impairment.

There are also implications regarding her competency to stand trial.  Dr. Glezer's evaluation examined this question.  The current evaluation did not specifically focus on this.  However, the results would suggest that there would be a question regarding her competency to stand trial.  Dr. Glezer does suggest that there are some concerns about competency such as stating "Dr. Ganesh has chosen to abdicate much of her decision making to her brother and husband…to formulate a defense".  I would suggest that the choice in this abdication is out of necessity in that she is unable to independently provide rational assistance to her attorney given her degree of cognitive impairment.  Her ability to learn information about the legal system and incorporate it into a rational understanding is similarly impaired.  She does display impairment with aspects of learning and memory but also has significant impairment with reasoning and development of concepts.  This would relate to how she is able to handle her legal situation.  It is evidenced with her continuing to be unaware of the implication of her current situation and the legal consequences that she can face.  She is not able to make reasonable decisions regarding a defense when she cannot understand her current status.  I believe that objective testing of her competency, beyond the psychiatric interview, in conjunction with the current evaluation would clearly indicate a lack of competency to stand trial.

DIAGNOSTIC IMPRESSION

Bipolar II Disorder
Panic Disorder
Mild Neurocognitive Disorder

RECOMMENDATIONS

1. Continuing use of psychotropic medication would appear to be warranted. Of particular concern is the underlying depression in addition to hypomanic features. There might be consideration as to addressing elements of thought disorder.
2. Evaluation on a neurological basis should be considered so as to determine possible etiology of the neurocognitive disorder.
3. Given her current level of function, continuing to carry out medical responsibilities would be problematic.
4. Given her level of impairment, objective evaluation of competency to stand trial might be considered so as to more fully address this question.

Thank you for the opportunity to be of assistance.

Howard J. Friedman, Ph.D., ABPP

HJF/aab

Cc: Vilashi Ganesh, M.D.
    Douglas F. Levinson, M.D.
    Daniel Horowitz, Esq.

## HOWARD J. FRIEDMAN, PH.D., ABPP
### CLINICAL NEUROPSYCHOLOGY

DIPLOMATES
AMERICAN BOARD OF CLINICAL NEUROPSYCHOLOGY
AMERICAN BOARD OF PROFESSIONAL NEUROPSYCHOLOGY
CA Lic. PSY 7986; NM Lic. 733

1855 SAN MIGUEL DR., SUITE 23
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: (925) 933-5594
FAX: (925) 933-0679

July 6, 2017


Douglas F. Levinson, M.D.
Stanford University School of Medicine
401 Quarry Road, Room 3322
Stanford, CA  94305-5797

Dear Dr. Levinson:

I am writing this as an addendum to the report that I issued on July 5, 2017.  This is in response
to your e-mailed questions regarding clarification of the validity scales on the MMPI-2-RF.

The specific T-scores that Dr. Ganesh had on the validity scales with the MMPI-2-RF in my
administration were as follows:

| Scale | T-Score |
| --- | --- |
| *Validity Scales* | |
| VRIN-r | 63 |
| TRIN-r | 50 |
| F-r | 120 |
| Fp-r | 111 |
| Fs | 115 |
| FBS-r | 105 |
| RBS | 109 |
| L-r | 71 |
| K-r | 38 |

The profile is invalid based on the elevations on the F-r and Fp-r scales.  There is not a
significant elevation on L or K scales.  Thus, she is not specifically portraying herself in a
manner that would suggest somewhat conscious distortion of results and, instead, the slight
elevation, for example, on the L-r scale would be in line with a more traditional upbringing.  The
primary concerns on the validity scales are, as noted above, the F-r and Fp-r scales.  The relative
elevation of these in comparison to other scales is an indication that she is experiencing
significant psychological difficulty leading to overreporting.  She tends to endorse most
symptoms that she sees on paper, which adds to these elevations.  There is a lack of
discrimination on her part regarding the symptoms.  However, she is consistent in her self-
description, a conclusion gleaned from the first two validity scales, that is, VRIN-r and TRIN-r.
Her overreporting, though, also extends to endorsing a variety of physical and cognitive
problems.  She overreports to an extent that her responses create an invalid profile and
embellishment of the extent of difficulties that she may be experiencing.  However, once again,
the overreporting is a likely by-product of her having significant disturbance.  The fact that she

does not report these difficulties within interview can relate to the extent of cognitive problems that she has. She is not able to assimilate the information into a conceptual understanding of what is going on with her. She does, however, endorse specific problems as they are presented to her in the form of this test. As you noted in your e-mail to me, questioning her about her specific responses provides some indication of a basis for the overendorsement. For example, she might endorse an item about hearing voices, but on questioning acknowledged that this is potentially hearing neighbors rather than hallucinatory experiences. Her cognitive impairment is such that she is not able to readily make sense of the items on the test. Thus, I see her problems on the validity scales of the MMPI being associated with her cognitive impairment rather than specific embellishment or malingering of reported difficulties.

Let me know if you have any further questions about this.

Sincerely,


Howard J. Friedman, Ph.D., ABPP

HJF/aab

Cc: Vilashi Ganesh, M.D.
    Daniel Horowitz, Esq.